## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: **LUPRON MARKETING**<br>**AND SALES PRACTICES LITIGATION** | **MDL No. 1430**<br>**Master File No. 01-CV-10861**<br>**Judge Richard G. Stearns** |
| THIS DOCUMENT RELATES TO: | |
| AETNA HEALTH, INC., Individually and<br>on Behalf of its Subsidiaries and Affiliates, as<br>Assignee or Otherwise,<br>980 Jolly Road<br>Blue Bell, PA 19422, | Civil No. 04-CV-10176 (RGS) |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| TAP PHARMACEUTICAL PRODUCTS, INC.,<br>675 North Field Drive<br>Lake Forest, Illinois 60045, | |
| Defendant. | |

## FIRST AMENDED COMPLAINT

Plaintiff Aetna Health, Inc., individually and on behalf of its subsidiaries and affiliates, as assignee or otherwise ("Aetna" or "Plaintiff"), avers as follows:

## INTRODUCTION

1.     This case is brought by Aetna, one of the nation's leading providers of health care, dental, pharmacy, group life, disability and long-term care products, individually and on behalf of its affiliates and subsidiaries, as assignee or otherwise, against defendant TAP Pharmaceutical Products, Inc. ("TAP" or "Defendant") to recover the significant financial harm

it suffered as a result of the Defendant defrauding and misleading Aetna with respect to the actual cost of TAP's prostate cancer drug Lupron®.

       2.     Since 1992, TAP (a wholly-owned joint venture of Abbott Laboratories ("Abbott") and Takeda Chemical Industries, Ltd. ("Takeda")) has been in the business of manufacturing, marketing and selling pharmaceuticals including Lupron®. During the period from 1992 through October 2001 ("Relevant Period"), the Defendant created and implemented a fraudulent marketing and sales scheme to increase substantially the sale of Lupron® and reap unlawful profits at the expense of Medicare, Medicare beneficiaries and private third-party payors of medical and pharmacy benefits such as Aetna. The Defendant systematically conspired with others to defraud (in violation of federal RICO statutes and Pennsylvania statutory and common law, as described below) the Medicare Program and Aetna, as a private provider of health care benefits, causing them to overpay by many millions of dollars for Lupron® administered in urologists' offices. The fraudulent and improper marketing and sales practices included such acts as: (a) deliberately and falsely overstating the average wholesale price ("AWP") for Lupron®, the rate upon which Medicare and private health insurance reimbursement rates are based, so that Medicare, Aetna and others paid artificially inflated prices and/or reimbursement rates for Lupron®; (b) providing free samples of Lupron® to health care providers and instructing them that they could and should bill Medicare and third-party payors for the free samples; and (c) providing other unlawful financial inducements to health care providers to prescribe Lupron®, and thereby maximize the revenue derived from the drug; and (d) actually concealing and causing others to conceal the actual pricing and sales figures for Lupron®.

3.    To carry out this scheme, the Defendant deliberately and falsely inflated the AWP, which is used by Medicare and Aetna to determine the reimbursement rates for Lupron®. The AWP relied upon by Medicare Program and Aetna, as well as other third-party payors, was significantly higher than the average sales price at which TAP offered Lupron® to providers and other customers for the drug. The difference between the AWP and the health care providers' actual acquisition cost was often referred to by the Defendant in internal documents as "spread," "return-to-practice," "return-on-investment," and "profit" available to providers who purchased Lupron®. The Defendant even prepared side-by-side comparisons of the "spreads" available on Lupron® versus their competitor's drug. These comparisons were used as a marketing and sales pitch to health care providers. In practice, this "spread" was the amount that Medicare and Aetna overpaid for each prescription of Lupron®. As a result of the Defendant's fraudulent scheme, the Medicare Program, senior citizens, disabled individuals and third-party payors like Aetna have paid millions of dollars in falsely inflated drug prices.

4.    For the claims submitted for or concerning Aetna's insureds, the inflated reimbursement payments for Lupron® were paid by Aetna.

5.    On October 3, 2001, TAP agreed to pay a record $875 million to settle criminal charges and civil claims (asserted by the federal government and all fifty states and the District of Columbia) that the company engaged in illegal conduct in the marketing, sale and pricing of Lupron®. TAP settled the governmental civil claims which alleged, *inter alia*, that TAP knowingly engaged in a marketing scheme pursuant to which it set the AWP of Lupron® at levels far higher than it was actually charging, in order to induce providers to choose Lupron® over competitor drugs. TAP also agreed to plead guilty to conspiracy to defraud the United

3

States by causing the sale of drug samples in violation of 18 U.S.C. § 371 and 21 U.S.C. §§ 333(b) and 331(t).

6.    While the United States has entered into plea agreements requiring the Defendant to reimburse the federal government for the fraudulent charges, Aetna has not recovered the millions of dollars it was fraudulently induced to overpay for Lupron® administered in providers' offices and reimbursement claims as a result of the Defendant's illegal conduct.  Aetna seeks reimbursement for the inflated co-payments and deductibles it overpaid in connection with its participation in Medicare-related health insurance programs. Aetna also seeks damages in the amount that the Defendant's fraudulent conduct caused it to overpay for Lupron under all health benefit plans issued, administrated, or insured by Aetna.[1]

### JURISDICTION AND VENUE

7.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because the claims in this action arise under the laws of the United States; pursuant to 18 U.S.C. § 1964 because this Court has jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962 (RICO); pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship and the amount in controversy exceeds $75,000; and pursuant to 28 U.S.C. § 1367(a) because this Court has supplemental jurisdiction over all non-federal claims in this action that form part of the same case or controversy as those within the Court's original jurisdiction.

---

[1] In addition to the damages it seeks on its own behalf, Aetna seeks to recover damages incurred by its self-insured and split-insured customers, as assignee or otherwise.  For ease of reference, as used herein "Aetna" shall mean Aetna and also its subsidiaries, affiliates, and self- and split-insured customers.

8.    The courts of the Eastern District of Pennsylvania have personal jurisdiction over the Defendant because it negotiated with and entered into agreements with Aetna, a Pennsylvania company, because Defendant has within the relevant time period had continuous and systematic contacts with the Commonwealth of Pennsylvania, and because much of the tortious activity described herein took place within the Commonwealth through providers, sales representatives, and other agents.

9.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391 because the Defendant transacted business in this district and a substantial part of the events or omissions giving rise to the claims in this action occurred here.

10.    The Judicial Panel on Multidistrict Litigation has, by Order dated January 22, 2004, ordered this matter transferred to this judicial district for coordinated and consolidated pre-trial proceedings in MDL No. 1430. The transfer was completed on January 26, 2004.

## PARTIES

11.    Plaintiff Aetna is a Pennsylvania corporation with its principal place of business in Pennsylvania.

12.    Aetna provides "Medicare+Choice" HMO coverage and other Medicare-related coverage to individuals covered by Medicare based upon the payment of a premium.

13.    Aetna also contracts with the federal government under its Medicare-related programs to provide health benefits to persons eligible for Medicare who chose to enroll

in Aetna's plans rather than obtain health-related services through a fee-for-service system under which the federal government makes program payments for each service.

14.    Aetna also provides health insurance to individuals and groups not covered by Medicare, through commercial insurance policies for which an individual or entity pays a premium. In connection with the above-described coverage plans, Aetna based its direct reimbursements, co-payments, coinsurance and deductibles for Lupron® upon or in reference to AWP. During the relevant period, Aetna has overpaid many millions of dollars as a result of fraudulently inflated AWP price listings for Lupron®.

15.    Defendant TAP Pharmaceutical Products, Inc. ("TAP"), formerly known as TAP Holdings, Inc., is a wholly owned joint venture between Takeda and Abbott incorporated in Delaware and with a principal place of business in Illinois. Under a partnership agreement between Abbott and Takeda, TAP (owned 50 percent by Abbott and 50 percent by Takeda), together with its subsidiary, TAP Pharmaceuticals, Inc., develops and markets pharmaceutical products for the United States and Canada. These products include Lupron® (an LHRH analog) and Lupron Depot® (a sustained release form of Lupron®). Lupron® and Lupron Depot® (collectively referred to as "Lupron®") are used principally for the palliative treatment of advanced prostate cancer, for the treatment of endometriosis, central precocious puberty, and for the preoperative treatment of patients with anemia caused by uterine fibroids. TAP also markets Prevacid®, a multi-billion dollar selling proton pump inhibitor and a leading agent in its market's class.

16.    According to Abbott's 2002 10-K filed with the SEC on February 19, 2003, Lupron® is sold directly to providers, retailers, wholesalers, health care facilities, and

government agencies. In 1998, the total revenues from Lupron® sales through Medicare was $584 million. TAP's total sales revenue in 2002 was $4 billion.

## BACKGROUND

17.    In the mid-1980s, the Defendant began marketing Lupron® as a treatment for prostate cancer. Defendant also has marketed Lupron® as a treatment for endometriosis, central precocious puberty, and for the preoperative treatment of patients with anemia caused by uterine fibroids.  In marketing Lupron®, the Defendant employed and maintained extensive marketing and sales departments.  Since at least the early 1990s, TAP's primary marketing efforts are focused on securing the use of Lupron® by providers.

18.    Lupron® is administered to patients in liquid form by intramuscular injection, typically in the buttocks or arm, by a physician or a nurse under the supervision of a physician. At various times in the 1990s and continuing to the present, Lupron® was available in daily, one month, three month or four month doses.  It was possible that a patient whose prostate cancer was being treated with Lupron® would receive regular injections of Lupron® for the remainder of his life.

## THE AWP PRICING SYSTEM

19.    Medical providers daily submit many thousands of reimbursement claims to insurance companies for prescription drugs provided to insurance companies' insureds.  The Medicare program and Aetna rely on widely-available published AWPs for reimbursement rates. In other words, the published AWPs are used by the Medicare program and Aetna as a basis for

calculating the proper amount to disburse to the treating provider after he or she administers a Lupron® injection to an insured.

20.    Several industry compendia periodically publish the AWPs for the tens of thousands of pharmaceuticals on the market. These include *Red Book*, published by Medical Economics Co., *Price Alert* (the electronic successor to *Blue Book*), published by First DataBank, and *Medispan*, published by WoltersKluwer. In periodically announcing the AWP for Lupron®, the Red Book and other publications simply publish the prices supplied to them by the Defendant.

21.    The AWP pricing system depends on the honesty of drug manufacturers like the Defendant. The Defendant knew that providers' actual acquisition cost for Lupron® was not publicly available, and kept this information highly confidential and secret.

22.    The Defendant knew that it could directly control and raise the AWP for Lupron® at any time by simply forwarding to *Red Book, Price Alert* and other publications a new and higher AWP.

23.    There are significant discrepancies between the AWP set by the Defendant for Lupron® and what the Defendant actually charged providers for the drug.

24.    The Defendant's pattern of fraudulent conduct in connection with artificially inflating the AWP for Lupron® caused Aetna to substantially overpay for Lupron®.

8

## THE MEDICARE INSURANCE PROGRAM

25.    While this case is not solely about Medicare, the Original Medicare program, and its method of using AWP as a basis for reimbursement for pharmaceuticals administered to Medicare beneficiaries, is an important factual predicate to the Defendant's fraudulent scheme described herein.

26.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.

27.    The U.S. Department of Health and Human Services ("HHS") is an agency of the United States and is responsible for the funding, administration and supervision of the Medicare Program.  During the Relevant Period, the Health Care Financing Administration ("HCFA") (now known as the Centers for Medicare and Medicaid services "CMS") was a division of HHS and directly responsible for the administration of the Medicare Program.

28.    Health care benefits covered under the Medicare Program are divided into two parts, Part A and Part B.  Medicare Part A covers hospital or institutional insurance, including such services as inpatient hospital care, skilled nursing facility and hospice care.  *See* 42 U.S.C. §§ 1395c-1395i-5.  The federal government's payments for enrollees' medical expenses under Part A are financed through federal income taxes levied on self-employment income and federal employment taxes on employees' wages.

29.    Medicare Part B provides supplemental medical insurance for such outpatient services as physician services, laboratory and diagnostic tests, medical supplies,

ambulance services, and certain prescription drugs. *See* 42 U.S.C. §§ 1395j-1395w-4. Part B is voluntary and requires payment of a monthly premium.

      30.    Persons enrolling in Medicare have two basic coverage options. They may (1) elect to obtain services through a fee-for-service system under which the federal government (or an administrator engaged by CMS) makes program payments for each service rendered ("Original Medicare"), or they may (2) elect to receive coverage from private third-party medical plans that include Medicare integration provisions, including Aetna's fee-for-service, point of service ("POS"), and preferred provider organization ("PPO") plans.

      31.    During the Relevant Period, Aetna contracted with the federal government to sponsor multiple Medicare-related programs. Under these programs, the government pays to Aetna a fixed monthly fee, or capitated amount, for each beneficiary enrolled in a Medicare-related program regardless of the actual costs, and in return Aetna provides coverage for the Medicare beneficiary, including reimbursements for Lupron®.

      32.    As a general matter, the Original Medicare Program does not cover the cost of pharmaceuticals that a Medicare beneficiary obtains pursuant to a prescription and thereafter self-administers (*e.g.,* by swallowing the drug in liquid or pill form). However, under Medicare Part B, some drugs, including injectables administered by a health care provider, are covered. Lupron® is an injectable drug, and it is covered under Medicare Part B.

      33.    In determining the "allowable amount"—that is, the amount Original Medicare will pay—Medicare calculates the allowed reimbursement amount for the drug based upon the payment methodology set forth in 42 C.F.R. § 405.517, a regulation published in the

Federal Register on November 25, 1991, and which became effective on or about January 1, 1992.

34.    Under Medicare Part B, health care providers are reimbursed for 80% of the allowable amount. The remaining 20% is paid by either the Medicare beneficiary or a private insurance company like Aetna pursuant to supplemental Medicare-related coverage. The 20% payment is called the "co-insurance" amount. All health care providers are required by law to send the Medicare beneficiary or his/her Medigap payor a bill for the 20% co-insurance, and they are also required to make attempts beyond merely billing to collect that amount. In addition, beneficiaries or their Medicare-related insurance carrier are required to pay an annual deductible amount before Part B benefits are payable.

35.    CMS has publicly announced that it uses the AWP published in pharmaceutical industry magazines as the basis for reimbursement for covered pharmaceuticals like Lupron®. For instance, in Program Memorandum AB-02-075 (as of May 22, 2002), CMS states that drugs and biologicals are paid based on the lower of the actual billed charge or 95 percent of the AWP reflected in pharmaceutical industry publication sources such as *Red Book*, *Price Alert*, or *Medispan*.

36.    There are significant discrepancies between the AWP set by the Defendant for Lupron® and the prices charged for Lupron® by the Defendant to health care providers and third-party purchasers of the drug. The AWP for Lupron® set by the Defendant does not reflect the plain meaning, or any reasonable interpretation, of the terms "average" or "wholesale."

11

37.    The Defendant's pattern of fraudulent conduct in artificially inflating the AWP for Lupron® above the actual average price directly caused Aetna to substantially overpay for those drugs.

## AETNA'S PRIVATE HEALTH INSURANCE COVERAGE

38.    In addition to its Medicare-related coverage plans, Aetna provides private health benefit plans to individuals and groups, through commercial insurance policies and managed care plans for which an individual or entity pays a premium. In connection with its private health insurance coverage plans, Aetna based its direct reimbursements, co-payments, coinsurance and deductibles for Lupron® upon or in reference to AWP.

39.    Aetna also acts as a third-party administrator for many self-insured and split-insured programs. "Self-insurance" means that an employer contracts with Aetna as third-party administrator to process claims and provide additional services for the customer. "Split-insurance" means that an employer sets up a fund out of which Aetna pays employees' claims up to a predetermined level (cap) for individual or total company claims. Once claims exceed this cap, Aetna provides health insurance for the employees.

40.    In connection with Aetna's Medicare-related plans, its private health insurance plans offered pursuant to a contract with the federal government (such as its Medicare+Choice plans) and its health plans issued pursuant to HMO laws and health benefit plans administered on behalf of self- and split-insured plan sponsors, Aetna relied upon TAP to provide reasonably accurate AWP information to *Red Book, Price Alert* and other publications.

TAP knew and intended that Aetna and other third-party payors use AWP to set reasonable fee schedules including its reimbursement rates for Lupron®.

41.    The Defendant's pattern of fraudulent conduct of artificially inflating the AWP for Lupron® directly caused Aetna to substantially overpay Lupron® in connection with reimbursements, co-payments, coinsurance and deductibles for privately-insured individuals receiving Lupron® from providers who obtained Lupron® either (a) directly from the Defendant; (b) through wholesalers or (c) through retail pharmacies.

42.    The Defendant's pattern of fraudulent conduct of artificially inflating the AWP for Lupron® above the actual average wholesale price directly caused Aetna to substantially overpay for the drug.

## DEFENDANT'S FRAUDULENT CONDUCT

### Artificially Inflating the Average Wholesale Price

43.    During the Relevant Period, the Defendant deliberately and intentionally charged health care providers across the United States a price substantially less than the AWP that the Defendant had reported to *Red Book, Price Alert* and other publications. The Defendant perpetuated this fraudulent scheme so that the health care providers who purchased Lupron® at a low cost could bill Medicare and third-party payors based upon the inflated AWP and earn a substantial profit from the "spread" between the acquisition or retail cost and the Medicare reimbursement rate or third-party payors' "reasonable fee schedules" (which set the rate at which providers can bill for Lupron® usage and which are directly based on AWP). This profit potential was created and marketed by the Defendant to influence a health care provider's

13

decision to administer Lupron® and thereby increase the Defendant's market share and revenues. TAP also may have induced physicians to administer Lupron® to patients where its use may not have been indicated—in accordance with complete prescribing information—as a means of increasing the Defendant's and the providers' profit.

44.    In furtherance of this scheme to defraud Medicare and Aetna, the Defendant created a centralized national marketing and sales plan that was planned and controlled by TAP, Abbott and Takeda, and implemented through the Defendant's employees and agents, to carry out essential parts of the scheme, among which are the following:

(a)    setting actual wholesale prices at which it sold Lupron®;

(b)    listing the AWP of Lupron® in *Red Book, Price Alert* and other publications at an amount materially greater than the actual average wholesale price;

(c)    contacting *Red Book, Price Alert* and other publications for the purpose of falsely setting and controlling the listed AWP;

(d)    providing information to health care providers about *Red Book* and *Price Alert*-quoted AWP and the actual average wholesale price for Lupron®;

(e)    creating and disseminating marketing and sales materials that showed the spread between the actual average wholesale price on the one hand, and the AWP reported in *Red Book, Price Alert* and other publications for the purposes of Medicare reimbursement rates on the other;

14

(f)    creating and disseminating marketing and sales materials for health care providers discussing how the use of free samples could increase their profits. (The "materials" were created at the local level—resulting in what the FDA calls "homemade bread." TAP encouraged this localized production of marketing materials through sales contests and awards);

(g)    creating and disseminating marketing and sales materials for health care providers discussing other financial inducements available from the Defendant for the usage of Lupron®. (This material was produced and promoted on the local level by district managers, who were in turn instructed on using the materials by "higher-ups" within TAP's home office and marketing & sales departments);

(h)    inducing patients and third-party payors, such as Aetna, to pay inflated direct reimbursements, co-payments, coinsurance and deductibles for Lupron® in reliance on the inflated AWP;

(i)    engaging in telephone conversations and mailings, to and from providers, to further its fraudulent scheme;

(j)    receiving the proceeds of the Defendant's schemes;

(k)    using or investigating the proceeds of the Defendant's schemes as a means of providing further free samples or other financial inducements to medical providers; and

(l)      mailing promotional literature to providers outlining how they could increase their profits by prescribing Lupron®.

45.      The Defendant knew and understood that the Medicare Program and third-party payors relied upon *Red Book, Price Alert* and other publications in determining the amount they would reimburse health care providers.    The Defendant therefore knew that it could manipulate the health care providers' profit by inflating the AWP as stated in these publications. By artificially inflating the amount of profit available to providers from Medicare and Aetna, the Defendant directly increased the demand for Lupron® market share for those drugs, along with the profit the Defendant received from Lupron®.

46.      As part of the Defendant's scheme, it instructed health care providers to submit claims reimbursement forms to Medicare and third-party payors either based directly on the fraudulently inflated AWP, or upon reasonable fee schedules (including reimbursement rates for Lupron®), which were themselves based upon AWP, rather than upon the actual cost of the drug.    Defendant referred to this inflated profit and the corresponding inducement to the providers as its "Return to Practice" program.

47.      On numerous occasions during the Relevant Period, the Defendant intentionally caused an artificially inflated AWP for Lupron® to be published.  Accordingly, the Defendant could control the amount of the financial incentive, or "return to practice", that a provider would receive by prescribing Lupron® to his/her patients and billing Medicare or Aetna at the AWP established by the Defendant.

16

48.    The AWP for an injection of a monthly dose of Lupron® 7.5 mg administered to a patient was significantly less than its actual average sales price, as follows:

| Year | Average Wholesale Price | TAP's Average Sales Price to Providers (based on available data) |
|------|------------------------|------------------------------------------------------------------|
| 1993 | $451.25 | $340 |
| 1994 | $463.75 | $346 |
| 1995 | $477.50 | $350 |
| 1996 | $496.25-$515.63 | $356 |
| 1997 | $515.63 | $329 |
| 1998 | $540.63 | $222 |
| 1999 | $594.65 | $207 |

49.    As these figures demonstrate, during the Relevant Period the published AWP for Lupron® continued to climb while providers' actual acquisition cost decreased substantially. High volume Lupron® purchasers could achieve even greater discounts. The Defendant's practice was to encourage providers who may have bought hundreds of "kits" of Lupron® at a time to bill as if they had bought just one "kit" at TAP's catalogue price, resulting in a substantial price differential. Discovery will provide pricing data for the entire Relevant Period, but as the figures listed above demonstrate, a larger difference between the published AWP and the actual acquisition cost meant a larger profit "spread" for the providers. This divergence between the AWP and the actual cost demonstrates that the Defendant was manipulating AWP at Medicare's expense and at the expense of third-party payors like Aetna.

17

50.     A typical over billing scenario for Lupron® under Aetna's private health insurance is that of Patient "A."[2]  After receiving an injection of Lupron® Depot 7.5 mg at his urologist's office on April 16, 1996 (the procedure is coded on the provider billing statement submitted to Aetna as "W9220"), Patient A's provider sent Aetna a bill for $600.  Aetna subsequently reimbursed the provider $496.25, which, as set forth above, was equal to the published AWP for early 1996.   The provider's actual acquisition cost for this dose was approximately $356. Aetna relied upon the Defendant's fraudulently inflated AWP figure as the benchmark for what it cost the provider to obtain the injection.  In reality, the Defendant's fraudulent conduct reduced the provider's actual acquisition cost to $356, a difference of $140.75.  Aetna was misled into making many thousands of such overpayments for Lupron® injections in reliance on the fraudulently inflated AWP.

51.     The Defendant intentionally used the artificially inflated AWP as a means of marketing Lupron®.  Specifically, when employees of the Defendant talked to health care providers about their choice of using either Lupron® or its competitor Zoladex®, or even about the alternative of no therapy at all—referred to as "watchful waiting,"—the Defendant emphasized that the monetary return to the providers would be higher if they used Lupron® because of its high AWP. Internal documents from the Defendant specifically showed that they deliberately used the spread to create greater demand for Lupron®.

52.     The benefit of the Defendant's illegal marketing scheme is seen in increased market share and sales of Lupron®.  In 2000, Lupron® sales were nearly $800 million as compared to $584 million in 1998.

---

[2] Patient name and identifier number removed to protect confidentiality.

### Use of Free Samples

53.     The Defendant, through its employees and agents, also provided health care providers with free samples of Lupron® in order to effectuate the scheme to fraudulently inflate AWP. The Defendant intentionally provided the free samples to providers to offset their total cost of purchasing Lupron®. These gifts were intended to increase the spread.

54.     As a means of inducing providers to continue purchasing Lupron®, TAP authorized its sales agents to give providers free samples. In many cases, the number of samples a provider received was dependent on the volume of the provider's Lupron® purchases.

55.     Moreover, in violation of the Prescription Drug Marketing Act, the Defendant's agents told health care providers that they could and should bill Medicare, Medicare beneficiaries and third-party payors, including Aetna, for the free samples. The providers thereafter prescribed and administered these free samples to patients insured by the Medicare Program, Aetna and others and submitted claims to Medicare, Aetna and others for prescription of these free doses, effectively turning the free samples into a cash kickback and rebate. These free samples were not used by TAP in calculating AWP.

### Other Financial Inducements

56.     The Defendant also provided and/or arranged for many other financial inducements to stimulate sales of Lupron®. Such inducements included volume discounts, rebates, off-invoice pricing, free goods, credit memos, and grants. For instance, when asked how many free televisions the Defendant had given away as part of TAP's aggressive marketing efforts, a member of the Defendant's finance department responded "more than there are urologists." All of these incentives were designed to lower the net cost to the health care

19

provider and provide them with additional incentives to prescribe Lupron® while concealing the actual cost of the drug from third-party payors, including Aetna.

57.     Another way Defendants channeled illicit payments to providers was through the "TAP into the Future" program, which consisted of sending providers to all-expense paid trips to luxurious resorts.    These junkets were disguised as educational or consulting programs.    All of the doctors in attendance were designated as "consultants" despite providing no consulting services.

58.    The Defendant used the "TAP into the Future" program to reward good customers and to motivate providers not to switch their patients to less expensive competitor drugs like Zoladex®.

59.    The Defendant, Abbott and Takeda closely monitored the price of Zoladex®, and the spread created by that drug's pricing. Thus, in mid-1995, while many TAP sales and marketing executives were at an award trip in Hawaii, word was received that the makers of Zoladex® had raised that drug's AWP, thus creating a better spread for providers who chose Zoladex® over Lupron®.

60.    Top executives of TAP, Abbott and Takeda met the same day by conference call to discuss and immediately approve raising the AWP for Lupron® to provide a greater spread than that provided for Zoladex®. Thus, the Defendant raised the already fictional AWP for Lupron® for no reason other than to maintain the spread available to providers.