61. In addition, Defendants maintained a special "SWAT Team" of Lupron® Medical Marketing Specialists who could be dispatched on short notice to the office of any large urology practice that was contemplating switching his or her patients to Zoladex®.

62. SWAT Team members had the authority to offer additional discounts in several forms, including free samples, credit memos, and sham "unrestricted educational grants" to induce a physician to stay with Lupron®.

63. The Defendant also used the "TAP into the Future" program to educate providers on how to respond to any attempt by third-party payors like Aetna to restrict the use of or reimbursement for Lupron®.

64. During the relevant period, the Defendant spent over $1 million on "TAP into the Future" outlays as a means of preserving market share and ensuring the success of its fraudulent schemes.

65. The Defendant conspired with others, including various health care providers, to accomplish the fraudulent schemes detailed herein in order to increase the sale of Lupron® and committed acts in furtherance of that conspiracy which are outlined in this Complaint.

## CONCEALMENT OF THE TRUTH

66. The Defendant concealed its fraudulent conduct from Aetna by controlling the process by which the AWP was set. The Defendant prevented Aetna from knowing what the actual prices or costs for Lupron® were, and prevented Aetna from knowing it was encouraging

providers to use free samples, seek reimbursement for these samples from Aetna, and providing other financial incentives to health care providers to induce them to use Lupron®.

67. The Defendant closely guarded its actual pricing and sales figures for Lupron®. The only pricing information ever publicly released was the AWP reported to industry compendia.

68. The Defendant did not provide Lupron® pricing data to "true cost" publications like IMS, which routinely collect and report sales data for the pharmaceutical industry. The Defendant also instructed providers to keep confidential their true Lupron® acquisition cost, as well as the price discounts and rebates which the Defendant provided in connection with Lupron® purchases.

69. The Defendant also retained lobbyists and attorneys to actively discourage government agencies from investigating the true prices charged for Lupron® and to discourage any agencies from switching to a reimbursement protocol based on figures other than AWP.

70. The Defendant's fraudulent conduct was of such a nature as to be self-concealing, and the Defendant's concerted efforts to conceal its true pricing for Lupron® demonstrates that it knew its conduct was fraudulent.

71. Aetna was diligent in pursuing an investigation of the claims asserted in this Complaint, but did not receive inquiry notice, nor did it learn of the factual basis for the claims in this Complaint and the injuries it has suffered, until or after October 3, 2001, when the Defendant agreed to pay a record $875 million to settle criminal charges and civil claims

(asserted by the federal government and all fifty states and the District of Columbia) that the company engaged in illegal conduct in the marketing, sale and pricing of Lupron®.

## USE OF THE MAILS AND WIRES

72.  For a decade, the Defendant used thousands of mail and interstate wire communications to create and manage its fraudulent scheme. The Defendant's scheme involved national marketing and sales plans, and encompassed physicians and victims across the country.

73.  The Defendant's use of the mail and wires to perpetrate fraud involved thousands of communications throughout the Relevant Period including, *inter alia*:

(a)  Marketing materials about the AWP for Lupron® and the available spread, profit or return to practice a physician could receive, such communications being sent to providers across the country;

(b)  Statements of the AWP made to *Red Book, Price Alert* and other publications, such communications being made at least annually and in many cases several times in a single year;

(c)  Thousands of communications discussing, confirming, and forwarding free samples of Lupron® which the Defendant understood providers would bill for;

(d)  Credit memos, inaccurate invoices, invoices reflecting a zero charge for Lupron® and other similar documents all designed to lessen and hide the actual price doctors paid for Lupron®;

23

(e) Communications, including checks, discussing and relating to grants, consulting fees, the "TAP into the Future" program, debt forgiveness, or other financial inducements, as detailed above;

(f) Communications with government agencies and private insurers that fraudulently represented the AWP as reasonably accurate or that were intended to deter investigations;

(g) Communications with health insurers and patients intended to induce payments Lupron® to be made in reliance on AWP; and

(h) Receiving the proceeds of its schemes.

## PROVIDERS' INVOLVEMENT

74. The providers, mainly urologists, that administered Lupron® were essential to the Defendant's fraudulent schemes because they actually sought reimbursement from Aetna. The providers were aware of the Defendant's schemes and were aware of the involvement of other similarly situated providers in the fraudulent schemes.

75. The providers operated collectively, for a common purpose and as a continuing unit to perpetrate the fraudulent schemes detailed herein.

76. The Defendant's fraudulent schemes herein may have induced providers to knowingly administer Lupron® to patients for whom it was not appropriate therapy.

77. The providers' collective knowledge, involvement and activity is evidenced by:

(a) The mass-market nature of the various promotional and sales material created by the Defendant and delivered by the Defendant and its agents to the providers. From their appearance and format, it was apparent that the sales and promotional materials were ready-made for distribution to a mass audience, not individually tailored for single providers;

(b) Providers' attendance at meetings sponsored by the Defendant, including "TAP into the Future" trips, during which the profits to be made from Lupron® usage was discussed with large numbers of providers;

(c) Providers' attendance at meetings of professional organizations, such as the American Urology Association, at which the Defendant established booths and exhibits discussing the spread and return to practice schemes;

(d) Providers' willful failure to inform government regulators (including HCFA and CMS), and third-party payors including Aetna, of the existence of the spread and the Defendant's return to practice schemes;

(e) Each providers' awareness that he or she was profiting from the disparity between the published AWP and their actual acquisition cost for Lupron®; and

(f) The aggressive lobbying by various physician professional groups against switching to a reimbursement protocol based on figures other than AWP.

78. Much of the tortious activity described herein took place within the Commonwealth of Pennsylvania, but the Defendant's conduct, as well as that of the providers, also violated the laws of other states.

## COUNT I
## RICO—Violation of 18 U.S.C. § 1962(c)
### (The Association-in-Fact Enterprise)

79. Plaintiff incorporates the preceding paragraphs as if fully set forth.

80. There exists an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of the Defendant, Abbott and Takeda ("the Enterprise").

81. The Enterprise is an ongoing organization which has a decision-making structure, and which functions as a continuing unit.

82. The Enterprise is separate and distinct from the pattern of racketeering activity alleged herein, and exists for purposes beyond those necessary to commit the predicate acts described herein.

83. TAP is a "person" within the meaning of 18 U.S.C. § 1961(3), and agreed to and did conduct the affairs the Enterprise through a pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

84. The Defendant engaged in the pattern of racketeering activity for the purpose of conducting the affairs and furthering the fraudulent aims of the Enterprise, which include, without limitation, (a) deliberately overstating the AWP for Lupron®, so that Medicare,

Medicare beneficiaries and third-party payors, including Aetna, paid an artificially-inflated amount of money for the drug, and (b) providing free samples and other financial inducements to medical providers to create greater demand for Lupron®.

85. In implementing the fraudulent schemes described herein, and in conducting the affairs of the Enterprise, the Defendant was acutely aware that Medicare, Medicare beneficiaries and third-party payors, including Aetna, depend on the honesty of the TAP Entities in setting the AWP with the *Red Book*, *Price Alert* and other industry publications, and the accuracy of information on claim forms.

86. Acting in furtherance of the fraudulent aims of the Enterprise, the Defendant engaged in and affected interstate commerce, because *inter alia*, it manufactured, marketed, sold, purchased and/or provided Lupron® injections to thousands of individuals throughout the United States.

87. The Defendant has controlled, conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes multiple related acts indictable under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) in connection with the sales and marketing of Lupron®, as follows:

  (a) The Defendant has asserted direct control over the price at which each medical provider purchased Lupron®;

(b)  The Defendant has asserted direct control over the price at which each medical provider was reimbursed by Medicare and Aetna by setting the AWP in *Red Book*, *Price Alert* and other industry publications;

(c)  The Defendant has asserted direct control over the creation and distribution of the marketing and sales materials given to medical providers through direct contacts, as well as through the mails and wires throughout the United States;

(d)  The Defendant has asserted direct control over the marketing and sales scheme to use the inflated Medicare reimbursement rate to create an artificial incentive to use Lupron®;

(e)  The Defendant has, through its employees and agents, promoted the scheme that involved free samples and other financial inducements through direct contacts with medical providers, as well as through the mails and wires; and

(f)  The Defendant has controlled and participated in the affairs of the Enterprise through the manufacture, marketing and sale of Lupron® and the creation and transfer of fraudulent financial inducements to the medical providers to buy or prescribe the drug.

88.  The Defendant's repeated violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 extended over a period of years and involved distinct and independent criminal acts. These acts were neither isolated nor sporadic, but involved the regular and repeated violation of law to accomplish the fraudulent scheme described herein. These acts were related by (a) common participants, (b) common victims, (c) common methods of commission through encouraging the

submission of inflated claims for Lupron® reimbursement, and (d) the common purpose and common result of defrauding Aetna and enriching the Defendant at Aetna's expense while concealing the Defendant's criminal activities. Each of the fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

89. Aetna relied to its detriment on the billing and reimbursement statements from HCFA, providers, pharmacies or other suppliers and medical providers that were sent to it through the United States mails and by facsimile transmissions. The billing statements contained inflated payments and co-payment claims caused by the Defendant's fraudulent acts.

90. The Defendant's repeated and continuing violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 were neither isolated nor sporadic events, but involve a callous and calculated series of violations of the law for the purpose of ensuring that Aetna, and its self-insured and split-insured customers, would be over-billed for Lupron®.

91. Aetna has been injured in its business and property by reason of the above-described pattern of racketeering in that Aetna has repeatedly and significantly overpaid for Lupron®.

92. Aetna's injuries were directly and proximately caused by the Defendant's racketeering activity as described above.

93. By virtue of these violations of 18 U.S.C. § 1962(c), the Defendant is liable to Aetna for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees and expenses.

## COUNT II
### RICO—Violation of 18 U.S.C. § 1962(c)
### (The TAP and Provider Enterprise)

94. Plaintiff incorporates the preceding paragraphs as if fully set forth.

95. In the alternative, there exists an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of the Defendant and the various providers throughout the United States who participated in the fraudulent schemes described above (the "Provider Enterprise").

96. The Provider Enterprise is an ongoing organization which has a decision-making structure, and which functions as a continuing unit.

97. The Provider Enterprise is separate and distinct from the pattern of racketeering activity alleged herein, and exists for purposes beyond those necessary to commit the predicate acts described herein.

98. TAP is a "person" within the meaning of 18 U.S.C. § 1961(3), and agreed to and did conduct the affairs the Enterprise through a pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(c).

99. The Defendant engaged in the pattern of racketeering activity for the purpose of conducting the affairs and furthering the fraudulent aims of the Enterprise, which include, without limitation, (a) deliberately overstating the AWP for Lupron®, so that Medicare, Medicare beneficiaries and third-party payors, including Aetna, paid an artificially-inflated amount of money for the drug, and (b) providing free samples and other financial inducements to medical providers to create greater demand for Lupron®.

100. In implementing the fraudulent schemes described herein, and in conducting the affairs of the Provider Enterprise, the Defendant was acutely aware that Medicare, Medicare beneficiaries and third-party payors, including Aetna, depend on the honesty of the TAP Entities in setting the AWP with the *Red Book*, *Price Alert* and other industry publications, and the accuracy of information on claim forms.

101. Acting in furtherance of the fraudulent aims of the Provider Enterprise, the Defendant engaged in and affected interstate commerce, because *inter alia*, it manufactured, marketed, sold, purchased and/or provided Lupron® injections to thousands of individuals throughout the United States.

102. The Defendant has controlled, conducted and participated in the affairs of the Provider Enterprise through a pattern of racketeering activity that includes multiple related acts indictable under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) in connection with the sales and marketing of Lupron®, as follows:

(a) The Defendant has asserted direct control over the price at which each medical provider purchased Lupron®;

(b)     The Defendant has asserted direct control over the price at which each medical provider was reimbursed by Medicare and Aetna by setting the AWP in *Red Book*, *Price Alert* and other industry publications;

(c)     The Defendant has asserted direct control over the creation and distribution of the marketing and sales materials given to medical providers through direct contacts, as well as through the mails and wires throughout the United States;

(d)     The Defendant has asserted direct control over the marketing and sales scheme to use the inflated Medicare reimbursement rate to create an artificial incentive to use Lupron®;

(e)     The Defendant has, through its employees and agents, promoted the scheme that involved free samples and other financial inducements through direct contacts with medical providers, as well as through the mails and wires; and

(f)     The Defendant has controlled and participated in the affairs of the Provider Enterprise through the manufacture, marketing and sale of Lupron® and the creation and transfer of fraudulent financial inducements to the medical providers to buy or prescribe the drug.

103.    The Defendant's repeated violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 extended over a period of years and involved distinct and independent criminal acts. These acts were neither isolated nor sporadic, but involved the regular and repeated violation of law to accomplish the fraudulent scheme described herein. These acts were related by (a) common

participants, (b) common victims, (c) common methods of commission through encouraging the submission of inflated claims for Lupron® reimbursement, and (d) the common purpose and common result of defrauding Aetna and enriching the Defendant at Aetna's expense while concealing the Defendant's criminal activities. Each of the fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, this conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

104. Aetna relied to its detriment on the billing and reimbursement statements from HCFA, providers, pharmacies or other suppliers and medical providers that were sent to it through the United States mails and by facsimile transmissions. The billing statements contained inflated payment and co-payment claims caused by the Defendant's fraudulent acts.

105. The Defendant's repeated and continuing violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 were neither isolated nor sporadic events, but involve a callous and calculated series of violations of the law for the purpose of ensuring that Aetna, and its self-insured and split-insured customers, would be over-billed for Lupron®.

106. Aetna has been injured in its business and property by reason of the above-described pattern of racketeering in that Aetna has repeatedly and significantly overpaid for Lupron®.

107. Aetna's injuries were directly and proximately caused by the Defendant's racketeering activity as described above.

108. By virtue of these violations of 18 U.S.C. § 1962(c), the Defendant is liable to Aetna for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees and expenses.

## COUNT III
### RICO—VIOLATION OF 18 U.S.C. § 1962(D)
### (Conspiracy to Commit RICO Offenses)

109. Plaintiff incorporates the preceding paragraphs as if fully set forth.

110. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions to subsection (a), (b), or (c) of this section."

111. The Defendant, Abbott and Takeda unlawfully conspired and agreed to violate 18 U.S.C. § 1962(c). The object to the conspiracy and agreement was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Association-in-Fact Enterprise and/or the Provider Enterprise, as described above, through a pattern of racketeering activity. The Defendant knew that its predicate acts of racketeering were part of a pattern of racketeering activity, and agreed to commit predicate acts in furtherance of its conspiracy to violate § 1962(c).

112. The Defendant, Abbott and Takeda took acts in furtherance of their conspiracy.

113. The above-described acts constitute a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

114. As a direct and proximate result of the above-described conspiracy in violation of 18 U.S.C. § 1962(d), Aetna was injured in its business or property in that it has repeatedly and significantly overpaid for Lupron®. Accordingly, the Defendant is liable to Aetna for three times the damages sustained, plus the costs of this suit, including reasonable attorneys' fees and expenses.

## COUNT IV
### INSURANCE FRAUD—VIOLATION OF 18 PA. C. S. § 4117

115. Plaintiff incorporates the preceding paragraphs as if fully set forth.

116. The Pennsylvania Insurance Fraud Statute, 18 Pa. C.S. § 4117(a)(2) provides that a person commits an offense if he or she:

> Knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

117. The Defendant knowingly and with intent to defraud has engaged in a pattern of causing false, incomplete, and misleading insurance claim information to be presented to Aetna.

118. The Defendant's fraudulent schemes consisted of: (a) deliberately overstating the AWP for Lupron®, so that Aetna paid an artificially inflated price for the drug; (b) providing free samples of Lupron® to health care providers and encouraging them to bill

35

Aetna, for the free samples; and (c) providing other financial inducements to health care providers to create greater demand for Lupron® and thereby maximize the revenue derived from the drug.

119.  The Defendant's schemes discussed in the previous paragraphs were calculated to ensure that Aetna would be over-billed for Lupron®.

120.  The Defendant engaged in a pattern of fraudulent conduct by artificially inflating the AWP, systematically providing health care providers with financial inducements to use Lupron®, and causing health care providers to fail to disclose in claims for reimbursement the true cost of the drug and the financial inducements.

121.  Each of the fraudulent acts detailed above constitutes "Insurance Fraud" within the meaning of 18 Pa. C. S. § 4117(a).  Collectively, these violations constitute a pattern of insurance fraud within the meaning of 18 Pa. C. S. § 4117(g).

122.  Much of the wrongful deceptive and unfair conduct detailed in this Complaint took place in Pennsylvania and/or caused injury to Aetna and others in Pennsylvania and elsewhere.

123.  In implementing its fraudulent scheme, the Defendant was acutely aware Aetna depends on the honesty of Defendant in setting the AWP with *Red Book, Price Alert* and other publications, and upon the accuracy of information on the claim forms.  Third-party payors including Aetna relied upon the reasonably accurate reporting of AWP to *Red Book, Price Alert* and other publications because, as the Defendant knew and intended, third party payors including

Aetna used AWP to set their reasonable fee schedules, including reimbursement rates for Lupron®.

124. The above-described pattern of insurance fraud amounted to a common course of conduct intended to deceive Aetna. Each such fraudulent act was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Aetna. The Defendant's fraudulent activities were and are part of its regular way of conducting its ongoing business, and constitute a present and continuing threat to the property of Aetna.

125. By reason of the foregoing, and as a proximate cause of said pattern of fraudulent activity and acts committed in furtherance thereof, Aetna has suffered grievous injury and has been damaged as alleged herein.

126. By virtue of these violations of 18 Pa. C. S. § 4117, the Defendant is liable to Aetna for three times the damages sustained, plus investigation expenses, costs of this suit, and reasonable attorneys' fees and expenses.

## COUNT V
## COMMON LAW FRAUD

127. Plaintiff incorporates the preceding paragraphs as if fully set forth.

128. The Defendant's misrepresentations and/or omissions discussed herein were knowingly false, misleading, and/or fraudulent or were made with reckless indifference to the truth.

129. The misrepresentations and omissions were material to the amounts Aetna reimbursed for prescriptions of Lupron®, and were made in order to induce Aetna to make higher payments.

130. Aetna reasonably relied on the misrepresentations or omissions made by or on behalf of the Defendant.

131. But for the Defendant's material misrepresentations and omissions, Aetna would not have overpaid for Lupron®, and would not have suffered the financial loss arising from the Defendant's deceptive schemes.

132. By reason of the foregoing, and as a proximate cause of said fraud and acts committed in furtherance thereof, Aetna has suffered grievous injury and has been damaged as alleged herein.

133. The acts alleged were malicious, oppressive and contrived for the purpose of achieving the objects of the fraud; therefore, Aetna is entitled to punitive damages.

### COUNT VI
### NEGLIGENT MISREPRESENTATION

134. Plaintiff incorporates the preceding paragraphs as if fully set forth.

135. The Defendant knew, or should have known, that Aetna would rely upon the representations of TAP and/or its agents as contained in *Red Book*, *Price Alert* and other publications concerning the AWP of Lupron®. Accordingly, the Defendant had a duty to know

what claims and submissions were being made by health care providers concerning Lupron®, and to cause the correction of any misstatement and/or omission regarding the same.

136. Defendant knew or should have known that Aetna would be damaged by the Defendant's efforts to artificially inflate the published AWP for Lupron®. Among the facts which Defendant knew or should have known was that Aetna based its reasonable fee schedules, including its reimbursement rates for Lupron®, on AWP data.

137. Defendant, on its own behalf or through its agents, caused Aetna to believe incorrectly that health care providers were paying at or near AWP rates for Lupron®, when in fact they were paying as little as 50% of AWP.

138. It was foreseeable to the Defendant that Aetna would rely upon the material misrepresentations and/or omissions made by or at the direction of the Defendant in determining the rates at which it would reimburse health care providers for Lupron®.

139. Aetna, without knowledge of the falsity of the representations and/or omissions made by or at the direction of the Defendant, did, in fact, rely on these misrepresentations and omissions to its detriment by basing its reimbursement rates for Lupron® on AWP data furnished by the Defendant.

140. Had Aetna known that the Defendant had no intention of charging health care providers at or near AWP-based prices for Lupron®, Aetna would have substantially adjusted its Lupron® reimbursement rates that were based on AWP data.

141.    As a result of Aetna's justifiable reliance on the misrepresentations and/or omissions made by the Defendant or at the Defendant's direction, Aetna was induced into overpaying for Lupron® and has suffered great financial loss.

142.    But for the Defendant's material misrepresentations and/or omissions, Aetna would not have suffered the financial loss arising from overpayment for Lupron®.

143.    By reason of the foregoing, and as a proximate cause of said negligent misrepresentations and acts committed in furtherance thereof, Aetna has suffered grievous injury and has been damaged as alleged herein.

## COUNT VII
### CIVIL CONSPIRACY

144.    Plaintiff incorporates the preceding paragraphs as if fully set forth.

145.    At all material times, the Defendant agreed, combined and/or conspired with others, including Abbott, Takeda, and various health care providers, in an effort to fraudulently induce Aetna into overpaying for Lupron®, to misrepresent or conceal material facts from Aetna, or to remain silent when it knew that Aetna was being misled by its misrepresentations and/or omissions and/or the misrepresentations and/or omissions of its co-conspirators.

146.    The Defendant knowingly and intentionally entered into a combination or agreement to commit the tortious acts complained of herein.